UNITED STATES v. BLAIR.

SAME v. INVESTORS' & TRADERS' REALTY CO.

(Circuit Court, S. D. New York. May 1, 1911.)

1. SHIPPING (§ 7*)—TONNAGE TAX ON USE OF FOREIGN-BUILT YACHTS—CONSTRUCTION OF STATUTE—"FOREIGN BUILT."

A yacht is "foreign built" within the meaning of Tariff Act Aug. 5, 1909, c. 6, § 37, 36 Stat. 112 (U. S. Comp. St. Supp. 1909, p. 1057), imposing a tonnage tax on the use of such yachts owned by citizens of the United States, if it was originally built in a foreign country, so long as it retains its identity, so that if a registered vessel of the United States, it could not be renamed, under Rev. St. § 4179 (U. S. Comp. St. 1901, p. 2831), without the consent of the Commissioner of Navigation; and short of such complete change of identity no amount expended thereon in this country for alterations, betterments, or even rebuilding, will convert it into a home-built vessel.

[Ed. Note.—For other cases, see Shipping, Dec. Dig. § 7.*]

2. SHIPPING (§ 7*)—TONNAGE TAX ON USE OF FOREIGN-BUILT YACHTS—PROCEEDINGS FOR COLLECTION.

The tonnage tax imposed on the use of foreign-built yachts owned by citizens of the United States by Tariff Act Aug. 5, 1909, c. 6, § 37, 36 Stat. 112 (U. S. Comp. St. Supp. 1909, p. 1057), being a tax upon the privilege of use is assessable to and collectible from the personal user, and the provision of the statute that such tax shall be levied and collected "by the collector of customs of the district nearest the residence of the managing owner" requires that where the owner resides in one district the collector of that district shall levy and collect the tax, and the attempted action of the collector of another district to that end is unwarranted and ineffective, and will not support an action to recover the tax.

[Ed. Note.—For other cases, see Shipping, Dec. Dig. § 7.*]

3. SHIPPING (§ 7*)—TONNAGE TAX ON USE OF FOREIGN-BUILT YACHTS—ASSESSMENT OF TAX—TONNAGE.

Where a foreign-built yacht, whose owner was subject to tonnage tax, under Tariff Act Aug. 5, 1909, c. 6, § 37, 36 Stat. 112 (U. S. Comp. St. Supp. 1909, p. 1057), had been enlarged so that her tonnage was increased, the collector in assessing the tax was entitled to have her remeasured.

[Ed. Note.—For other cases, see Shipping, Dec. Dig. § 7.*]

4. WORDS AND PHRASES—"BUILT"—"REBUILT."

Anything which is "built" is formed "by uniting materials into a regular structure," and that which is "rebuilt" is constructed "after having been demolished."

[Ed. Note.—For other definitions, see Words and Phrases, vol. 1, pp. 887, 888; vol. 7, pp. 5986, 5987.]

At Law. Actions by the United States against C. Ledyard Blair and against the Investors' & Traders' Realty Company. On trial by court on consent. Judgment for defendant in first case, and for plaintiff in second.

Actions to recover one year's tax under section 37 of the tariff act of 1909; defendants being severally the owners of yachts alleged to be foreign built.

The material facts in the Blair case are as follows:

Defendant is a citizen of the United States and domiciled and resident therein. On September 1, 1909, he was the owner and managing owner of the yacht Diana, a vessel of a gross tonnage of 785.6 tons. On or about said

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

last-mentioned date the collector of customs at the port of New York assumed to levy a tax alleged to be pursuant to the statute above mentioned at the rate of $7 per gross ton upon the use of the said yacht, the amount of said tax being $5,502.

The Yacht Maria was built in Glasgow, Scotland, in 1896; in 1902 she was sold to an American citizen (Mr. Bourne), who renamed her the Delaware; he used her as a pleasure vessel until 1905. During Mr. Bourne's ownership of her approximately $30,000 was spent in improving and bettering the Delaware, said expenditures being exclusive of those payments properly chargeable to maintenance or upkeep. In February, 1905, while lying at Hoboken, N. J., the Delaware was burned, most of her upper works being totally destroyed, her engines so injured that they had to be dismantled, and her steel plating badly warped. So much water was pumped into her to put out the fire that she sank, though apparently there was not enough water at her berth to permit her to go out of sight. The wreck passed into the hands of Mr. Chubb, apparently as agent for underwriters. That gentleman raised and rebuilt the yacht at an expense of approximately $86,000, and he renamed the rebuilt vessel Diana. In 1906 Mr. Chubb sold the Diana to the defendant, and between the date of his purchase and the date of levying the tax Mr. Blair has expended on the Diana for betterments and improvements approximately $24,000. Exclusive of salvage the actual expenditures for rebuilding of and improvements upon the wrecked Delaware amount to approximately $121,000, and Mr. Chubb paid for the wreck $35,500 after, as above noted. Mr. Bourne had expended for new construction on the Delaware, about $30,000. She is not worth as much as the amount expended upon her in America.

At the time of the action aforesaid by the collector of the port of New York the defendant was a resident of Peapack, N. J., and there had his domicile, being also a citizen of the state of New Jersey. The collector of the port of New York is not the collector of the district nearest the residence of the defendant. The bill of sale from Mr. Chubb to defendant was recorded in the office of the collector for the port of New York. Defendant has largely used the Diana within the territorial jurisdiction of the United States as well as in foreign waters.

The material facts in the case of the Investors' & Traders' Realty Company are as follows:

Defendant is a citizen of the United States and is a corporation whose "residence" is nearest the collection district in charge of the collector of the port of New York. On September 1, 1909, it was the owner and managing owner of the yacht Allita, a vessel of unknown gross tonnage. On or about said last-mentioned date said collector of customs at the port of New York levied a tax pursuant to the statute above mentioned at the rate of $7 per gross ton upon the use of said yacht, the amount of said tax being $504.

The Allita was originally the Gadabout, of 71.86 tons, built at Montreal, Canada. As the Algonquin she passed into the possession of J. H. Flagler in 1900. It does not appear that at the time of her transfer to Flagler she had been injured or received substantial changes in structure. Having paid $10,000 for the Algonquin, Mr. Flagler lengthened her by inserting approximately 26 ft. amidships. He also changed the shape of her stern and rebuilt the bow. The vessel had auxiliary steam, and as lengthened and enlarged the old engine, boilers, and wheel were not suitable and were not used. The old boilers and engine were traded for new ones, and including the difference paid for the new propulsive power Mr. Flagler expended upward of $46,000 in changing the Algonquin, which he then renamed the Allita. In 1908 he transferred her (in the process of a real estate transaction) to the defendant company, which has never used her as a yacht, and evidently accepted the vessel only to sell again. The bill of sale from Flagler to defendant was recorded in the collector's office of the port of New York, July 7, 1909.

Mr. Pratt, Asst. U. S. Atty.
Mr. Byrne, for defendant Blair.
Mr. Miller, for Investors' & Traders' Realty **Co.**

HOUGH, District Judge (after stating the facts as above). These actions raise a point not discussed in the decision of Noyes, J. (190 Fed. 359), lately filed in these cases, viz., what is meant by the phrase "foreign-built yacht." The Blair case also requires answer to the inquiry: What is the force and effect of the statutory words that the tax "shall be levied and collected by the collector of customs of the district nearest the residence of the managing owner"? The action against the Investors' & Traders' Company also suggests (though it was not argued) the inquiry as to how the gross tonnage by which ' the tax is measured is to be ascertained.

[1] I. The meaning of the phrase "foreign-built": This may be considered from three points of view: (a) What is its signification in the shipping trade and among those familiar with maritime affairs? (b) What light is cast on the inquiry by general usuage as evidenced by lexicographers? (c) Are there any decisions of authority? ·

(a) No expert evidence as to the meaning of the phrase was introduced at the trial, ·but an investigation of congressional publications shows that it was suggested to Congress by those who petitioned for the legislation which finally became the section now under consideration. It appears from House document 1505, 60th Congress, 2d Session (Tariff Hearings, vol. 7, p. 7526 et seq.) that a considerable number of ship chandlers, and one shipbuilder, petitioned for the passage of· an act laying an ad valorem duty of 75 per cent. on any _foreign-built yacht_ thereafter purchased by any citizen of the United States, and several amusing if not instructive reasons were advanced in favor of the proposed law, one of them being that the tariff would not be prohibitive because "a certain proportion of the very rich men of America are apparently determined to possess foreign-built yachts at any price without regard to circumstances." Congress was furnished with a long list of obnoxious vessels alleged to be foreign built and American owned, which list is thought to include every yacht now under consideration. It may fairly be presumed that in legislating upon the prayer of any portion of the shipbuilding community Congress used language in the sense in which it was proposed, and it is in my judgment common knowledge that any person using the language of the sea means by a "foreign-built" vessel one originally constructed outside the United States, no matter how extensive the changes, alterations, or repairs bestowed upon her here may have been.

[4] (b) Anything which is built is formed "by uniting materials into a regular structure," and that which is rebuilt is constructed "after having been demolished." Changing the name of the Algonquin to Allita, or of the Delaware to Diana, effected nothing. Neither of these vessels was strictly speaking even rebuilt, for neither had been demolished. The Allita was merely enlarged, while the Diana was both repaired and enlarged.

(c) It appears to me that the reasoning of The Grace Meade, Fed. Cas. No. 15,243, is plainly applicable here. Rev. St. § 4179 (U. S. Comp. St. 1901, p. 2831) prohibits changing the name of any "vessel of the United States"; ·i.e., of any vessel lawfully registered, enrolled,

or licensed pursuant to legislative authority. The object of that statute is plainly to mark and preserve the identity of any named vessel. As long as the vessel is the same the name must be the same unless changed pursuant to other (and here unimportant) statutes. That decision laid down very clearly the rules by which identity should be determined:

"It may be held as a principle that where the keel, stem and sternposts and ribs of an old vessel, without being broken up and forming an intact frame, are built upon as a skeleton, the case is one of an old vessel rebuilt and not of a new vessel. Indeed without regard to the particular parts re-used, if any considerable part of the hull and skeleton of an old vessel in its intact condition, without being broken up is built upon, the law holds that in such a case it is the old vessel rebuilt and not a new vessel."

The Diana and the Allita in their present condition are either foreign built or home built. If they are home built they must have been constructed when Messrs. Chubb and Flagler respectively expended such extraordinary sums on them. The same vessel can only be built once; she may be rebuilt many times, but that does not destroy identity under the decision quoted. If they were not new vessels, and new vessels in the technical sense of that word, when they were respectively put into commission after lengthening the Algonquin and after the fire on the Delaware, then they are the same vessels as they were before, however greatly changed in outward appearance, in value, or material. If these two yachts had been originally home built, and that had been done to them which was done, could their respective owners have given new names to them without due application to the Commissioner of Navigation? Plainly not, under the language of the decision above quoted. And if the identity of the vessels was not sufficiently destroyed to authorize rechristening if they had been vessels of the United States, they must remain foreign built. Even American rebuilding cannot change that. It is therefore held that both the Allita and the Diana are foreign-built yachts as that phrase is used in the statute under consideration.

[2] II. The force of the phrase designating the officers by whom the tax "shall be levied and collected." However shadowy in practice the difference is between a tax upon the potential use of a yacht and the yacht itself, especially when such tax may be perpetually commuted by the payment of an ad valorem duty, it is admittedly essential to the government's position that the taxation be directed against the privilege of use, and therefore assessable to and collectible from the personal user. It is then highly appropriate that, like almost every other personal tax, the place of taxation shall be the residence of the person taxed, and such is the plain direction of the statute. It is therefore obvious to me that when the act declares that a particular collector shall levy and collect the tax, it means that he must do something by way of apprising the person who is called upon to pay of the claim made. It seems elementary that if one particular officer is charged with the duty, no other officer can lawfully perform that duty.

The word "levy" in law has had many meanings attributed to it (see a collection of them, Words and Phrases, tit. "Levy"), but

nothing suitable to any meaning given was done by the collector nearest the residence of Mr. Blair. Whatever was done was the act of the corresponding functionary in New York. It is not for the defendant to declare what is necessary; it is enough that the designated official did nothing, so that the government to prevail in this action must assert (as is done arguendo) that if in any way, or by any person, notice of the tax is given to the yacht owner and he does not pay, an action such as this can be maintained. For this claim no basis is perceived.

[3] III. The measurement of tonnage. The complaint against the Investors' & Traders' Company alleges that the collector of customs "duly levied upon the use of the said yacht * * * a sum equivalent to a tonnage tax of $7 per ton, to wit $504." This is evidently $7 a ton on the original tonnage of the vessel. It is common knowledge that the result of what was done to the Allita was to increase her tonnage; yet in her last recorded bill of sale she is still described as being of the same tonnage that she was when she was 26 feet shorter. The fact appears to be that the tonnage has been taken from her documenting, and the documents not being required by any statute of the United States have been continued without any remeasurement. This tax is therefore incorrect, but as it is plainly less than the government would be entitled to demand, the defendant is not in a position to object.

Judgment is directed in accordance with these findings.